GERBER, J.
 

 The plaintiff claimed that the defendant negligently repaired her truck, which later caught fire while she was driving, causing her personal injuries and loss of the truck. At the jury trial, after the plaintiff rested, the defendant moved for a directed verdict. The defendant argued that the plaintiff did not present any evidence that the defendant negligently repaired the truck
 
 *549
 
 or caused the fire. The trial court granted the motion. We reverse. We find that the plaintiff presented sufficient evidence to avoid a directed verdict.
 

 We present the evidence introduced at trial in the light most favorable to the plaintiff as the nonmoving party.
 
 See Meruelo v. Mark Andrew of Palm Beaches, Ltd.,
 
 12 So.3d 247, 250 (Fla. 4th DCA 2009) (“ ‘When an appellate court reviews the grant of a directed verdict, it must view the evidence and all inferences of fact in a light most favorable to the nonmoving party.’ ”) (citation omitted).
 

 The plaintiff and her partner purchased a truck for their roofing business. At the time of the purchase, the truck was fifteen years old and had been driven roughly 55,000 miles. The plaintiffs partner road-tested the truck and obtained the truck’s service history before the purchase. However, he did not have a mechanic inspect the truck.
 

 The plaintiff and her partner drove the truck weekly for the next three months without any problems. However, one day the plaintiffs partner was driving the truck on a highway when it began “bucking” and would not continue running at highway speed. The plaintiffs partner had the truck towed to the defendant’s auto repair shop. The plaintiffs partner told the defendant’s mechanic what occurred on the highway. The mechanic said he would “check out the fuel tanks and the filters.”
 

 When the plaintiff and her partner came to pick up the truck the next day, they asked the defendant’s mechanic what the problem was. The mechanic said that “the fuel lines were messed up.” According to the plaintiff, the mechanic said “he worked on the fuel lines and he did something with the fuel filter. He said he flushed something out.” The plaintiff testified:
 

 [The mechanic] opened the hood to show us exactly what he did.... I got on the left-hand side of the truck, [my partner] was behind me, and [the mechanic] was on the right-hand side ... He was pointing at a piece in the middle of the thing. He said the line’s here. And I don’t know if he meant the fuel lines, filter or whatever, but the little piece in the middle ... he said he worked on.
 

 The plaintiffs partner testified:
 

 As we were going over the invoice, I remember opening the hood.... I remember [the plaintiff] was on one side and [the mechanic] was on the other, and [the mechanic] was pointing to several things under the engine compartment of where he had worked on and it was done in a few minutes....
 

 The plaintiffs partner added that the mechanic “[explained the fuel lines, filter, pretty much it.” When the plaintiffs partner was asked to describe which lines the mechanic said he flushed out, the plaintiffs partner responded that the lines were those “on the backside of the engine between the engine and the firewall of the truck.”
 

 The mechanic gave the plaintiff an invoice which indicated that the mechanic checked the ignition system and fuel system, drained the right fuel tank, replaced the fuel filter, flushed the fuel lines, fixed a fuel line, and replaced the fuel line case.
 

 After this repair, the plaintiffs partner drove the truck and continued to experience the same “bucking” problem. According to the plaintiff, “[the truck] was doing the same thing. It was, like, bucking, like not getting fuel.” Two or three weeks later, they took the truck back to the defendant. The plaintiffs partner told the defendant’s mechanic that the problem was not corrected. The mechanic responded that he would “look at it again.”
 

 
 *550
 
 A few days later, the mechanic called the plaintiff and her partner to say that the work was finished. According to both the plaintiff and her partner, the mechanic said that he worked on the fuel lines again. The defendant did not charge for, or generate an invoice for, this second repair.
 

 The plaintiffs partner testified that the truck “ran fine after the second [repair]. It had a little bit of bucking to it, but nothing like it was.” However, five or six weeks after the second repair, the plaintiff was driving the truck on the highway and it began to sputter “like [it was] not getting fuel, like [it was] going to stall.” According to the plaintiff:
 

 I was pushing my foot on the fuel and I wasn’t getting any fuel. So I started to smell gas really, really bad....
 

 So the truck started to slow down, so I went across the two lanes on the left-hand side, right along the median or whatever, and I started to slow down. And I slowed down, and I got the truck into park and that’s when the fire started. The flames came up through my legs, through the steering wheel.
 

 The plaintiff could not get out of the truck using her door, so she dove out of the truck through her open window. Although she did not suffer any burns to her skin, the hair on her body and head was singed. The truck and its contents were a total loss.
 

 The plaintiff and her partner had the truck towed back to their business. They later had the truck towed to a storage yard one lot over from their business. The storage yard was fenced in and under lock and key. To the knowledge of plaintiff and her partner, the truck was not altered after the fire.
 

 The fire lieutenant who responded to the fire testified that, after looking inside the engine compartment, he determined that “the fuel lines were the cause of the fire.” He reasoned:
 

 Generally fire burns upwards, so you take a downward triangle of flame pattern where it looks the hottest. And wherever the downward part of the triangle starts or points to, generally that is where the fire started.
 

 When the lieutenant was asked if he was able to localize within the engine compartment where the fire started, he responded, “From what I stated [in my report], it looks like the back wall of the engine compartment closer to the cab was the origin of the fire moving forward.” However, he said he did not consider himself to be an expert in determining fire origin. He determined that there was some type of fuel leak because “there was fuel on the ground leading up to the vehicle.” However, he could not determine whether the fire caused the fuel leak or the fuel leak caused the fire. He said an electrical fire can occur in a vehicle and could burn into a fuel line. However, he added that “[generally ... [w]e don’t have a lot of fuel leaking in electrical to start a fire in the car.” He was unable to offer an opinion on whether the defendant’s repairs had any bearing on the fire. He also could not determine where along fuel line there was a rupture, or why the fuel line ruptured.
 

 The plaintiff had a master automobile technician inspect the truck two years after the fire and then testify as an expert witness. The technician stated the following. Flushing a fuel line requires removing the fuel line from the engine. Removing the fuel line requires a special tool to release two safety locks holding the fuel line in place. When the fuel line is put back together, the locks have to be reinstalled. There is no way for the fuel line to separate from the engine with the locks on.
 

 
 *551
 
 The technician further testified that this truck had two fuel line connections. However, on the connection to the back of the engine, the locks were not attached together or in place. He said there is no way to unbolt the locks other than with the special hand tool. Neither a sledge hammer nor a high pressure water hose could knock off the locks. As a result, the fuel line was separated from the engine by an inch or inch-and-a-half. If the fuel line was not connected properly with the locks, the fuel line can come apart due to pressure from the fuel pump. It could take days, weeks, or months for that disconnection to occur. When it occurs, fuel will come out. It will spill onto the middle of the engine. In the technician’s opinion, the fuel line separated because “it wasn’t properly attached or it wasn’t locked properly with a lock on it.” Not locking the fuel line properly would be a breach of a mechanic’s standard of care.
 

 The technician testified that the alternator could cause an electrical fire in a truck. However, on this truck, the alternator and its connections were intact. In the technician’s opinion, the alternator could not have been the source of an electrical fire in this truck.
 

 After the plaintiff rested, the defendant moved for a directed verdict. The defendant argued that the plaintiff did not present evidence that the defendant negligently repaired the truck or caused the fire. According to the defendant, there was no evidence that its mechanic disconnected the fuel line. The defendant contended that the only way the plaintiff could prove her case was by “a pyramiding of impermissible inferences.” The plaintiff responded by relying on the technician’s testimony that there is no way for the fuel line to have come apart but for not being properly locked. The plaintiff also relied on the technician’s opinion that the fuel would spill onto the middle of the engine, and on the fire lieutenant’s testimony that the fire started at the middle of the engine where the fuel line was separated.
 

 The trial court asked the plaintiff what testimony she presented that the mechanic worked on the particular line which was disconnected. The plaintiff relied on the invoice which indicated that the mechanic flushed the fuel lines. The court replied that the truck had multiple fuel lines. The court also questioned the absence of testimony from the defendant’s mechanic. The court then granted the motion for directed verdict, reasoning:
 

 I don’t have any testimony to reflect that this particular defendant ever touched or, in fact, inspected the alleged, and I say that with the greatest of reservation, the fuel line in this truck.
 

 What I have — the only inference of the testimony that we have in this case is that [the plaintiffs] expert, another mechanic, went out two months ago on some two — almost two years after this vehicle [was] in the care, custody and control of the defendant and moved around to independent places and so forth, so saw a fuel line that was open and didn’t — wasn’t locked.
 

 And from there we’re supposed to opine that one, that’s where the fuel— that’s where the — that was the condition that it was in at the time that this occurred.
 

 Two, that a fire started and emanated from that particular point.
 

 And three, that the defendant somehow did — caused or should have known that that was a potential problem. And I don’t have that testimony here.
 

 And you know, I’m granting the motion for directed verdict.
 

 This appeal followed. Our review is de novo.
 
 See Meruelo,
 
 12 So.3d at 250 (“The standard for reviewing a trial court’s
 
 *552
 
 ruling on a motion for directed verdict is de novo.”)- We can affirm only if no proper view of the evidence could sustain a verdict in favor of the plaintiff.
 
 See id.
 
 (“When an appellate court reviews the grant of a directed verdict, it ... can affirm ... only where no proper view of the evidence could sustain a vei-dict in favor of the
 
 nonmoving
 
 party.”). Because this case is a negligence action, we review the order granting the directed verdict with special caution.
 
 See Union Carbide Corp. v. Kavanaugh,
 
 879 So.2d 42, 44 (Fla. 4th DCA 2004) (“ ‘In negligence actions, a motion for directed verdict should be treated with special caution because it is the function of the jury to weigh and evaluate the evidence.’ ”) (citation omitted).
 

 We find that a proper view of the evidence could sustain a verdict in favor of the plaintiff. First, the plaintiff presented prima facie evidence that the defendant negligently repaired the truck. The plaintiffs expert technician testified that the standard of care for a mechanic after flushing the fuel lines requires the mechanic to reinstall the locks. However, he observed that, on the connection to the back of the engine, the locks were not attached together or in place. According to the technician, there was no way to unbolt the locks other than with the special hand tool. He also said that neither a sledge hammer nor a high pressure water hose could knock off the locks. He therefore concluded that the fuel line separated because “it wasn’t properly attached or it wasn’t locked properly with a lock on it.” Viewing the technician’s testimony in the light most favorable to the plaintiff, a reasonable inference could be made that the defendant failed to use reasonable care in locking the fuel line to the back of the engine. If the fuel line was not locked properly before the defendant’s mechanic performed the work, the duty of reasonable care obligated the mechanic to lock the fuel line after he performed the work.
 

 Second, the plaintiff presented prima fa-cie evidence that the defendant’s failure to use reasonable care caused the fire which led to the plaintiffs injuries. As the technician stated, if the fuel line was not connected properly with the locks, the fuel line could come apart due to pressure from the fuel pump. When it occurs, fuel will come out. It will spill onto the middle of the engine. The technician’s testimony is consistent with the plaintiffs testimony that, on the day of the fire, she could smell gas and the truck began to sputter like it was not getting fuel. The technician’s testimony also is consistent with the fire lieutenant’s testimony that the fire started at the middle of the engine where the fuel line was separated. The technician also testified that the alternator could not have been the source of an electrical fire in the truck. Viewing the totality of this evidence in the light most favorable to the plaintiff, a reasonable inference could be made that the defendant’s failure to use reasonable care caused the fire which led to the plaintiffs damages.
 

 In sum, because a proper view of the evidence could sustain a verdict in favor of the plaintiff, we reverse the directed verdict and remand for a new trial.
 

 Reversed, and remanded.
 

 MAY and DAMOORGIAN, JJ., concur.